**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| LAUSTEVEION JOHNSON, | |
| Plaintiff, | 3:14-cv-00303-MMD-VPC |
| v. | |
| WILLIAM MOORE, *et al.*, | **REPORT AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE** |
| Defendants. | |

This Report and Recommendation is made to the Miranda M. Du, United States District Judge.  The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4.  Before the court is defendants' motion for summary judgment (#42), plaintiff's opposition (#51), and defendants' reply (#55).  Also before the court is plaintiff's motion for summary judgment (#47), which defendants moved to strike (#50).  Plaintiff opposed defendants' motion (#52), defendants replied (#54), and plaintiff responded to oppose and to request that the court rule on his motion for summary judgment (#57).

Having thoroughly reviewed the record and papers, the court recommends that defendants' motion for summary judgment be granted in part and denied in part, defendants' motion to strike be granted, and plaintiff's motion that the court rule on his motion for summary judgment be denied as moot.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Lausteveion Johnson ("plaintiff") is an inmate in the custody of the Nevada Department of Corrections ("NDOC").  Plaintiff is presently incarcerated at High Desert State Prison, but the alleged events giving rise to this case occurred at Ely State Prison ("ESP") in Ely, Nevada, where plaintiff was previously held.  Pursuant to 42 U.S.C. § 1983, plaintiff brings a variety of civil rights claims against ESP and NDOC officials.

The District Court screened the complaint on August 5, 2014, and permitted certain claims to proceed (#3).  In counts I and II, plaintiff alleges violations of his Eighth Amendment rights.

Specifically, in count I, plaintiff challenges the conditions of confinement at ESP, alleging that defendants Renee Baker, William Moore, Michael Fletcher, Dr. Michael Koehn, and James Greg Cox denied him basic human needs, medical care, and sanitation.  (*Id.* at 3.)  In count II, plaintiff alleges that Baker, Moore, Fletcher, and Cox failed to protect him from violence at the hands of his cellmate, inmate Zachery Simmons.  (*Id.* at 7.)  Count III asserts a First Amendment retaliation claim, in which plaintiff contends that Baker, Moore, Fletcher, and Cox retaliated against him for filing lawsuits, grievances, and kites.[1]  (*Id.* at 9.)  Finally, in count IV, plaintiff alleges that Baker, Moore, Cox, and Koehn denied him equal protection under the law, in violation of the Fourteenth Amendment, with regard to ESPs cane and wheelchair policy, ankle restraints, and cell placements.  (*Id.* at 10.)  Plaintiff seeks monetary damages, injunctive relief, and declaratory relief against defendants in their individual and official capacities.  (*Id.* at 3; #4 at 2–3.)

## II.    MOTION TO STRIKE

On February 11, 2015, this court issued a scheduling order and established a June 11, 2015 deadline for parties to file dispositive motions.  (#21 at 2.)  The court warned in that order that "[a]ny motion filed beyond the time limit . . . shall be stricken, unless the Court grants an exception for good cause shown."  (*Id.*)  For good cause, the court granted three separate motions to extend time, on June 10 (#33), June 22 (#36), and July 2 (#39).  The court's July 2 order set a new deadline of July 16 for dispositive motions.  (#39.)  No further extensions were requested by either party.

Defendants filed their motion for summary judgment on July 16.  (#42 at 1.)  Plaintiff's motion for summary judgment, however, was not received and filed by the Clerk's Office until July 30, two weeks beyond the filing deadline.  (#47 at 1.)  Thus, on August 12, defendants filed a motion to strike plaintiff's motion for summary judgment as untimely.  (#50 at 3–4.)

"Any dispositive motion filed after the deadline in the scheduling order . . . can be denied solely on the ground that it was untimely."  *Igbinovia v. Catholic Healthcare W.*, No. 2:07-cv-

---

[1] Plaintiff also alleged First Amendment retaliation against defendant Fletcher Stephens.  However, on May 8, 2015, the district court ordered that defendant Stephens be dismissed from this action pursuant to Fed. R. Civ. P. 4(m).  (#30.)

01170-GMN, 2011 WL 3424591, at *2 (D. Nev. Aug. 4, 2011) (citing *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 608–09 (9th Cir. 1992)).

Plaintiff argues that the delay in filing was caused by defendants' refusal to copy his legal work or weigh his mail. The court is not persuaded. Plaintiff once requested, and the court granted, an extension of time due to delays with copying; clearly, plaintiff is capable of seeking such an extension prior to the filing deadline. (*See* #34; #36.) Further, plaintiff submitted his motion for summary judgment without copies of his exhibits attached, shedding doubt on his assertion that he could not meet the deadline due to a delay in receiving his copy work. (*See* #47.)

Plaintiff also contends he submitted the motion on time, and that "he has no control over how fast the defendants send out his mail after he submits it." (#52 at 1.) Recognizing the difficulties prisoners may have with mailing legal documents, courts adhere to the "prison mailbox rule." *See Douglas v.* Noelle, 567 F.3d 1103, 1106 (9th Cir. 2011). Under that rule, the date of filing is the date a prisoner delivers his legal document to prison officials for mailing to the court. *Id.* Plaintiff dated his motion's certificate of service July 10, 2015, six days before the filing deadline and twenty days before the motion was filed. (#47 at 24.) However, the court finds that application of the prison mailbox inappropriate here, where the court had already extended the filing deadline multiple times. Thus, the court grants defendants' motion to strike. In doing so, the court notes that because plaintiff's summary judgment motion appears to present the same arguments and evidence set forth in his opposition (*compare* #47 *with* #51), the decision in no way deprives plaintiff of an opportunity to be heard.

## III.  DISCUSSION

### A.  Legal Standard

Summary judgment allows the court to avoid unnecessary trials. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). The court properly grants summary judgment when the record demonstrates that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). "[T]he substantive law will identify which facts are material. Only disputes over facts that

might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.   Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" only where a reasonable jury could find for the nonmoving party.   *Id.*   Conclusory statements, speculative opinions, pleading allegations, or other assertions uncorroborated by facts are insufficient to establish a genuine dispute.  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996).  At this stage, the court's role is to verify that reasonable minds could differ when interpreting the record; the court does not weigh the evidence or determine its truth.  *Schmidt v. Contra Costa Cnty.*, 693 F.3d 1122, 1132 (9th Cir. 2012); *Nw. Motorcycle Ass'n*, 18 F.3d at 1472.

Summary judgment proceeds in burden-shifting steps.  A moving party who does not bear the burden of proof at trial "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element" to support its case.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos*., 210 F.3d 1099, 1102 (9th Cir. 2000).  Ultimately, the moving party must demonstrate, on the basis of authenticated evidence, that the record forecloses the possibility of a reasonable jury finding in favor of the nonmoving party as to disputed material facts.  *Celotex*, 477 U.S. at 323; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).  The court views all evidence and any inferences arising therefrom in the light most favorable to the nonmoving party.  *Colwell v. Bannister*, 763 F.3d 1060, 1065 (9th Cir. 2014).

Where the moving party meets its burden, the burden shifts to the nonmoving party to "designate specific facts demonstrating the existence of genuine issues for trial."   *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).  "This burden is not a light one," and requires the nonmoving party to "show more than the mere existence of a scintilla of evidence. . . .  In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor."  *Id.* (citations omitted).  The nonmoving party may defeat the summary judgment motion only by setting forth specific facts that illustrate a genuine dispute

requiring a factfinder's resolution. *Liberty Lobby*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324. Although the nonmoving party need not produce authenticated evidence, Fed. R. Civ. P. 56(c), mere assertions, pleading allegations, and "metaphysical doubt as to the material facts" will not defeat a properly-supported and meritorious summary judgment motion, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

For purposes of opposing summary judgment, the contentions offered by a *pro se* litigant in motions and pleadings are admissible to the extent that the contents are based on personal knowledge and set forth facts that would be admissible into evidence, and the litigant attested under penalty of perjury that they were true and correct. *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

**B.     Civil Rights Claims Under § 1983**

42 U.S.C. § 1983 aims "to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006) (quoting *McDade v. West*, 223 F.3d 1135, 1139 (9th Cir. 2000)).   The statute "provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights[,]" *Conn v. Gabbert*, 526 U.S. 286, 290 (1999), and therefore "serves as the procedural device for enforcing substantive provisions of the Constitution and federal statutes," *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).  Claims under § 1983 require a plaintiff to allege (1) the violation of a federally-protected right by (2) a person or official acting under the color of state law.  *Warner*, 451 F.3d at 1067.  A causal connection must be established, by which the state actor performed an affirmative act, participated in another's affirmative act, or failed to perform an affirmative act that he or she was legally obligated to perform, and so caused the complained-of constitutional deprivation. *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). Further, to prevail on a § 1983 claim, the plaintiff must establish each of the elements required to prove an infringement of the underlying constitutional or statutory right.

In this case, defendants are each state prison officials acting within their respective capacities under state law.  Plaintiff alleges violations of his constitutional rights.  Therefore, he has

satisfied § 1983's threshold requirements and the court proceeds to analysis of his constitutional claims. However, plaintiff's claims for damages against defendants in their official capacities must be dismissed under the sovereign immunity doctrine. *Brown v. Oregon Dep't of Corrs.,* 751 F.3d 983, 988–89 (9th Cir. 2014) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984)). Thus, the court will consider the his official capacity claims only to the extent that he seeks declaratory and prospective injunctive relief. *See Thornton v. Brown*, 757 F.3d 834, 839 (9th Cir. 2013).

## C.    Count I: Conditions of Confinement

The Eighth Amendment "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency" by prohibiting imposition of cruel and unusual punishment by state actors. *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). Inmates may challenge conditions of confinement that are exceptionally cruel. However, "[t]he Eighth Amendment is not a basis for broad prison reform. It requires neither that prisons be comfortable nor that they provide every amenity that one might find desirable." *Hallett v. Morgan*, 296 F.3d 732, 745 (9th Cir. 2002) (quoting *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982)). In assessing inmates' claims, "courts must bear in mind that their inquiries 'spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility.'" *Rhodes v. Chapman*, 452, U.S. 337, 351 (1981) (quoting *Bell v. Wolfish*, 451 U.S. 520, 529 (1979)).

To challenge the conditions of confinement at a prison, a plaintiff must make two showings. *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000) (internal citations omitted), *abrogated on other grounds by Jones v. Bock*, 549 U.S. 199, 127 (2007). "First, the plaintiff must make an 'objective' showing that the deprivation was 'sufficiently serious' to form the basis for an Eighth Amendment violation." *Id.* This element may be satisfied by showing a deprivation of essential minimums, such as adequate food, clothing, shelter, or medical care. *Id.* Second, the plaintiff must "make a subjective showing that the deprivation occurred with deliberate indifference to the inmate's health or safety." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010). The deliberate indifference

1    element itself involves a two part inquiry to determine whether the official acted "with a sufficiently

2    culpable state of mind."  *Johnson*, 217 F.3d at 731 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298

3    (1991)).  The official must have been aware of a substantial risk of harm to the inmate's health or

4    safety, and also must not have had a "'reasonable' justification for the deprivation, in spite of that

5    risk."  *Thomas*, 611 F.3d at 1150.  Accordingly, "prison officials who actually knew of a substantial

6    risk to inmate health or safety may be found free from liability if they responded reasonably to the

7    risk, even if the harm ultimately was not averted."  *Farmer v. Brennan*, 511 U.S. 825, 845 (1994).

8         Plaintiff alleges that defendants Baker, Fletcher, Cox, and Koehn were "aware of" and

9    "subjected plaintiff" to conditions of confinement that violated the Eighth Amendment.  (#4 at 4–5.)

10   More specifically, he challenges ESP's fire safety system, double celling policy and overcrowding,

11   medical emergency button procedures, hand and ankle restraint policies, unsanitary conditions, and

12   mental health care, and medical care.  Each issue is addressed in turn.

13        **a.      Fire Safety System**

14         In his complaint, plaintiff contends that the ESP fire safety system is inadequate because

15   there are no fire extinguishers in the prison units, the prison lacks an evacuation plan, and inmates

16   are not evacuated when fires do occur.  (#4 at 5, 17.)  Because inmates are locked in their cells

17   during fires, plaintiff maintains that they are "forced to endure smoke inhalation which could lead

18   to throat problems" or other health impacts.  (*Id.* at 5.)

19         "Prisoners have the right not to be subjected to the unreasonable threat of injury or death by

20   fire . . . ."  *Hoptowit v. Spellman*, 753 F.2d 779, 784 (9th Cir. 1984).  However, defendants have

21   submitted evidence demonstrating that plaintiff cannot meet the objective prong of his "conditions

22   of confinement" claim.  First, the sworn declaration of Lance Marshall, ESP Facility Supervisor II,

23   belies plaintiff's claim with regard to fire extinguishers.   According to Marshall, three fire

24   extinguishers are located in the control bubble of each prison unit.  (#42-1 at 1.)  The extinguishers

25   are checked monthly, and corrections officers are trained to use them.  (*Id.* at 1, 3.)  In addition,

26   each ESP unit contains an air ventilation system, exhaust vent, overhead sprinkler systems, and

27   infrared smoke and air particulate detection systems.  (*Id.* at 2.)  "If a fire generates any measurable

1   amount of smoke, the infrared fire detection system would be triggered and the negative air flow

2   system activated, thus causing the smoke generated by the fire to be sucked into [the cell's] exhaust

3   vent and preventing the smoke from disbursing throughout the unit and entering other cells." (*Id.* at

4   3.) Plaintiff presents no evidence to refute Marshall's statements. (*See* #51 at 15, 17.)

5       Next, defendants attach Operational Procedure ("OP") 110 and OP 107, which detail the

6   prison's fire safety procedures and emergency evacuation plan. (*See* #42-10 at 2–6; #43-4 at 2–6.)

7   Conceding in his opposition that an evacuation plan exists, plaintiff insists that ESP is *effectively*

8   without a plan because officials refuse to follow it. (#51 at 15.) In light of OP 110 and OP 107,

9   however, the burden is on plaintiff to articulate facts showing a triable issue remains. Generalized

10  assertions that inmates are confined in their cells during institutional fires are insufficient. Plaintiff

11  does not describe the size, proximity, or duration of any specific fires and, at least in the case of

12  small or distant fires, keeping inmates in their cells may well be the safest option.

13      Assuming *arguendo* that plaintiff could show a sufficiently serious deprivation, plaintiff has

14  not alleged any facts to suggest that the named officials knew of and ignored the deprivation despite

15  the threat to inmate safety. Plaintiff's claim cannot proceed if he cannot make both the subjective

16  and objective showing. Accordingly, defendants are entitled to summary judgment as to this claim.

17          **b.    Double-Celling / Overcrowding**

18      Plaintiff next challenges ESP's policy of double celling inmates who, like himself, were on

19  23/24-hour lockdown. Because the cells are designed to accommodate just one inmate, plaintiff

20  contends, only one inmate can walk on the cell floor at once or cellmates will bump into each other.

21  (#4 at 5.) The lack of space creates a hostile environment, increases agitation, and leads to "fights,

22  deaths, or rapes." (#4 at 5, 17–18.) Relatedly, plaintiff maintains that the prison is overcrowded

23  and understaffed, and prison officials are unable to adequately supervise or protect inmates who are

24  double-celled. (*Id.*) Plaintiff credits double-celling and inadequate supervision with an assault

25  perpetuated on him by inmate Simmons. (*Id.* at 18.) Defendants, in turn, argue that double celling

26  at ESP did not violate plaintiff's Eighth Amendment rights because plaintiff requested to be double

27  celled, suggested or approved his cellmates, and suffered no verifiable physical harm. (#42 at 13–

14.)  Defendants do not address plaintiff's characterization of the cell dimensions, or that double celling increases the likelihood of violence amongst inmates.

In *Rhodes v. Chapman*, the Supreme Court held that double celling is not a *per se* violation of the Eighth Amendment.  452 U.S. at 348–49.  There, however, double celling "did not lead to deprivations of essential food, medical care, or sanitation[,] increase violence among inmates[,] or create other conditions intolerable for prison confinement."  *Id.* at 348.  Under the circumstances, long prison sentences, overcrowding, small cell sizes, and the amount of time inmates spent in their cells "amount[ed] to a theory that double celling inflicts pain," but did not give rise to a constitutional violation.  *Id.* at 348–49.  Still, the Court left open the possibility that double celling may indeed "be an infliction of unnecessary and wanton pain" if, for example, the policy led to rioting.  *Id.* at 349 n.14.  Relying on *Chapman*, the Ninth Circuit held in *Toussaint v. Yockey* that plaintiffs were likely to succeed on their constitutional challenge to a California prison's double celling policy because "double celling exacerbated the already bad conditions existing in [the] cells and engendered violence, tension, and psychiatric problems."  722 F.2d 1490, 1492 (9th Cir. 1984).

In this case, plaintiff expressly argues that double celling increases hostilities and the chance of violence between double-celled inmates on lockdown.  Although the court has serious doubts as to the merits of plaintiff's claim,[2] defendants have not pointed to evidence that challenges or undermines those particular allegations.  Accordingly, the court recommends that plaintiff's challenge to the ESP double celling policy proceed.

---

[2] The court finds the Southern District of New York's reasoning in *Jones v. Goord*, 435 F. Supp. 2d 221, 240–41 (S.D.N.Y. 2006) persuasive:

> As a matter of logic, it certainly must be true that inmates placed in a double cell are subjected to a higher risk of assault than inmates placed in a single cell.  That is because, all else being equal, an inmate in a double cell has at least some risk of being assaulted by his cellmate, while an inmate in a single cell is subjected to no such risk.  Thus, for whatever period of time inmates spend in their cells, a double-celled inmate bears the risk of assault from a cellmate, while a single-celled inmate is spared this risk.  However, this unavoidable increase in risk cannot in and of itself violate the Constitution; otherwise double-celling would be unconstitutional *per se*, or would be constitutional only if cellmates never assaulted each other.  That is not the law.

-9-

### c. Medical Emergency Button

Plaintiff contends that the emergency call buttons located inside of inmates' cells are inadequate to ensure inmate safety because ESP officials ignore inmates' calls. (#4 at 18.) In their motion for summary judgment, defendants provide the declarations of defendant Fletcher, ESP Associate Warden, and of Dawn Jones, ESP Correctional Nurse, to describe how the inmate call buttons are used. (#42 at 15.) According to Fletcher, when an inmate presses the call button, a corresponding light appears on the control panel in the unit control bubble to alert the ESP official on duty. (#42-4 at 3.) The official responds to the call via an intercom. (*Id.*) Fletcher declares that officials do not ignore inmates' calls. (*Id.*) Similarly, Jones stated that once the call button is pressed, the official in the control bubble will communicate with the inmate regarding the nature of the call, and will respond by summoning emergency or medical staff as necessary. (#42-6 at 1.)

Plaintiff, in turn, simply repeats the allegations of his complaint, presenting no additional, specific facts to support his claim. (*See* #51 at 12, 81.) As a consequence, plaintiff fails to demonstrate that there is a genuine issue for trial. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) ("[T]his court has refused to find a 'genuine issue' where the only evidence presented is 'uncorroborated and self-serving' testimony."). Summary judgment as to this issue is warranted.

### d. Restraints

Plaintiff argues that the way in which ESP officials handcuff and shackle prisoners violates the Eighth Amendment on two grounds. First, he argues that the policy of handcuffing an inmate before he leaves his cell "poses a great risk" because an unhandcuffed cellmate could attack the inmate in handcuffs, who is vulnerable and unable to fight back. (#4 at 19.) Were such a situation to occur, ESP policy would then preclude the ESP official from opening the door to stop the fight; instead, he or she would call the emergency response team, which may not arrive for twenty minutes. (*Id.*) Notably, plaintiff describes the just the possibility, but not the actual occurrence, of such incidents.

As to this first claim, defendants argue that plaintiff has not alleged that he was ever attacked by a cellmate in the manner described, and his transfer out of ESP means that an injury from such an attack is not "actual or imminent." (#42 at 16.)  Accordingly, defendants assert that the claim is barred by 42 U.S.C. § 1997e(e) and *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). (*Id.*)

To the extent that plaintiff seeks damages for mental and emotional injuries related to the ESP restraint policy, the court agrees that such recovery is barred by 42 U.S.C. § 1997e(e). Pursuant to that section of the Prison Litigation Reform Act, an inmate may not bring a federal civil action "for mental or emotional injury suffered while in custody without a prior showing of physical injury. . . ." 42 U.S.C. §1997e(e).  However, plaintiff also seeks a declaratory judgment that the restraint policy violates the Eighth Amendment, an injunction, and damages for the alleged violation of his constitutional rights. (#4 at 31.)  Those alternative forms of relief are not barred by § 1997e(e).  *See Greening v. Miller-Stout*, 739 F.3d 1235, 1238 (9th Cir. 2014).  In addition, plaintiff easily satisfies *Lujan*'s test for standing.  Plaintiff alleges that the restraint policy created an unreasonable and unnecessary risk of severe harm, and constituted a deprivation of his rights under the Eighth Amendment. (#4 at 19; #51 at 13.)  The alleged injury is concrete, particularized, and actual.  *See Lujan*, 504 U.S. at 560.

Nevertheless, the court finds that summary judgment is warranted.  As the Ninth Circuit has explained, "for the protection of staff and other inmates, prison authorities may place a dangerous inmate in shackles and handcuffs when they move him from his cell."  *Keenan v. Hall*, 83 F.3d 1083, 1092 (9th Cir. 1996).  Plaintiff was sent to ESP for a 575-day disciplinary segregation sanction after he was found guilty of assault upon and running from a corrections officer. (#42-4 at 2; #42-20 at 2.)  OP 711 outlines the procedures followed when any inmate housed in segregation is moved from his cell to the shower, recreation yard, or elsewhere: the escorting official will apply handcuffs first, through a slot in the cell door, and then open the door to secure leg restraints. (#42-19 at 16, 17, 19.)  Exceptions to the procedure are only granted by medical directive and with the approval of the warden. (*Id.* at 20.)  Given the threat inmates in segregation pose to the safety of

corrections officers, as well as plaintiff's own history, plaintiff has presented no evidence to suggest that he can make the objective or subjective showing required to establish an Eighth Amendment violation.  Even if defendants knew the restraint policy would increase a risk to inmate health and safety, no reasonable jury could conclude that its imposition was wanton or unreasonable.

The second basis for plaintiff's attack concerns the restraints themselves.  Plaintiff alleges that the ankle shackles cut into his and other inmates' heels, creating open wounds.  (#4 at 20.) Further, plaintiff maintains that ESP officials do not sanitize the bloody shackles following use, and thus expose inmates to various diseases.  (*Id.*)

Here again, plaintiff's allegations are insufficient to demonstrate that he was exposed to a substantial risk of harm, or that officials knew of and disregarded that risk.  Plaintiff relies on *Spain v. Procunier*, 600 F.2d 189 (9th Cir. 1979), but misconstrues its holding.  *Spain* did not declare, as plaintiff contends, that the use of ankle manacles whenever an inmate left his cell was cruel and unusual punishment.  (#51 at 14.)  Rather, the Ninth Circuit found that the use of neck chains on inmates was excessive, painful, and degrading where inmates were also required to wear handcuffs, a waist chain, and leg manacles; the neck chains were used for a four-and-a-half-year period; and inmates were made to wear neck chains during visits with family, friends, and counsel.  *Spain*, 600 F.2d at 196–97.  Such harsh requirements are certainly not present here.  Further, Ninth Circuit precedent clearly allows prison officials to use shackles and restraints when moving dangerous inmates.  *Keenan*, 83 F.3d at 1092; *Barker v. Fugazzi*, 18 Fed. App'x 663, 664 (9th Cir. 2001); *LeMaire v. Maass*, 12 F.3d 1444, 1457 (9th Cir. 1993).

With regard to the risk posed by bloody restraints, the Fletcher declaration states that ESP staff is instructed to wipe down restraints with alcohol wipes if blood or other bodily fluids are present.  (#42-4 at 3.)  In addition, inmates may either request that restraints be loosened or kite for larger sized restraints if those used are too tight.  (*Id.*)  Plaintiff has not alleged that he asked for and was denied looser restraints, or that he or any other inmate actually contracted a disease.  Nothing in the record suggests that these defendants knew, or should have known, that the restraints

presented an intolerable risk of injury.  Plaintiff may have experienced minor injuries from the ankle restraints, but they do not rise to the level of an Eighth Amendment violation.

###### e. Unsanitary Conditions

Plaintiff also challenges what he considers to be unsafe and unsanitary conditions at ESP. According to plaintiff, when taken to the showers he was forced to kneel down in dirty, stagnant water to have the ankle shackles removed.  (#4 at 22.)  In addition, ESP officials did not provide him with adequate cleaning supplies to thoroughly clean his cell or himself.  (*Id.*)

"Unquestionably, subjection of a prisoner to lack of sanitation that is severe or prolonged can constitute an infliction of pain within the meaning of the Eighth Amendment." *Anderson v. Cnty. of Kern*, 45 F.3d 1310, 1314 (9th Cir. 1995).  However, a claim that prison officials have failed to provide adequate cleaning supplies "must be evaluated in light of the overall squalor at the penitentiary." *Spellman*, 753 F.2d at 784.  In *Spellman*, the court concluded that the lack of cleaning supplies amounted to a constitutional violation in light of evidence of dank air, standing water, flooded toilets and sinks, and a vermin infestation throughout the prison.  *Id.*  At ESP, in contrast, OP 516 dictates that inmates are to be provided with a whiskbroom, sponge, disinfectant cleaner, and paper towels for ten minutes once a week to clean their cells.  (#42-2 at 3; #42-22 at 4–5.)  The stainless-steel showers have a slight slope in the floor to prevent stagnant water, and are cleaned by prison staff daily.  (#42-2 at 3; #42-22 at 3; #42-23 at 2–3.)  Even if the procedures outlined in OP 516 are not fully adhered to, as plaintiff contends, plaintiff concedes that he was provided with body soap once a week and powdered cleaner every two to three weeks.  (#4 at 22.)

Plaintiff maintains that he can prove the unsanitary conditions at ESP are dangerous with the help of grievances and affidavits from other ESP inmates.  (#51 at 31.)  However, plaintiff failed to file such evidence with his opposition.  Thus, based on the record before it, the court finds no indication that the ESP cells, showers, or general cleaning policies present a substantial health risk. Defendants are entitled to summary judgment on this claim.  *See Botelho v. Hawaii*, No. CIV. 06-00096 DAE, 2015 WL 2088877, at *15 (D. Haw. Feb. 25, 2010); *Standley v. Ryan*, No. CV 10–1867–PHX–DGC (ECV), 2012 WL 3288728, at *14–*15 (D. Ariz. Aug. 13, 2012).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

### f.   Mental Health Care

Although many of plaintiff's assertions regarding the inadequacy of ESP's mental health care are illegible (*see* #51 at 33, 35), the essence of his claim is that ESP inmates are not provided adequate one-on-one mental health treatment because the prison is understaffed (#4 at 19).  Plaintiff maintains that he "constantly requested" and was denied one-on-one mental health sessions, and that the lack of care, combined with other prison conditions, prompted him to attempt suicide.  (*Id.*)

In support of summary judgment, defendants submit numerous kites that plaintiff wrote between 2012 and 2014, in which plaintiff requested mental health classes or treatment sessions; an ESP official answered each kite and either provided class information or sought to schedule a counseling appointment.  (*See* #43-5 at 2–11.)  In addition, plaintiff's health records demonstrate that plaintiff received one-on-one counseling on July 25, 2013, September 5, 2013, and December 19, 2013.  (*Id.* at 25–27.)  On February 13, 2013, plaintiff refused to attend his scheduled one-on-one session. (*Id.* at 31.)

Plaintiff may have preferred additional treatment sessions, but the evidence of record demonstrates that plaintiff's challenge is unfounded.  Rather than act with deliberate indifference to plaintiff's health needs, defendants consistently responded to and supported plaintiff's requests for treatment.

### g.   Medical Care / No Cane Policy

Plaintiff's final challenge to the conditions of confinement asserts that ESP officials subscribe to a "no cane policy," but in fact provide white inmates with canes as needed.  (#4 at 20.)  As plaintiff has provided no evidence that such a policy or practice exists, the court must conclude that he cannot make the objective or subjective showings necessary for an Eighth Amendment claim, and that summary judgment on behalf of defendants is proper.

### D.   Count II: Failure to Protect

Plaintiff's failure to protect claim arises from the following events.  Plaintiff was sent to ESP on February 1, 2012, to serve a disciplinary sanction, and remained at the prison until November 19, 2014.  (#42 at 11; #51 at 4.)  Plaintiff requested to suspend his sanction, and as a

consequence was double-celled with several different cellmates during his time at ESP.  (#42-3 at 2–3; #51 at 17.)  On or around March 18, 2014, plaintiff was apparently celled alone; defendant Moore, a caseworker, allegedly came to the cell and told plaintiff that he would be written up if he did not approve a new cellmate.  (#4 at 11.)  Moore then suggested plaintiff house with inmate Simmons, whom he described as quiet, peaceful, and "not into fighting or making trouble . . . ." (*Id.* at 12.)

The ESP Housing Committee approved the placement on March 20, 2014, and Simmons moved into plaintiff's cell on March 21.  (#43-13 at 4; #4 at 12.)  Plaintiff contends that issues arose immediately.  On April 29, 2014, Moore spoke with Simmons at the cell, and Simmons requested to be moved.  (#42-3 at 4; #4 at 12.)  Moore told the two inmates that each would need to find another cellmate first.  (#4 at 12.)  Whether Simmons told Moore the nature of their problems, and whether Moore knew that Simmons had a history of violence, is in dispute.  (*See id.* at 12, 23; #42-3 at 4; #42-26 at 9–10.)  According to plaintiff, Simmons told Moore that he would attack plaintiff if he was not moved, and that he had been in fights with cellmates before; Moore allegedly responded that he was aware of Simmons's record, looked at plaintiff, and smiled.  (#4 at 12–13.)  Plaintiff submitted a grievance describing the interaction that afternoon.  (#42-26.)

Hostilities apparently came to a head on May 1, 2014, when Simmons "could no longer restrain his rage" and violently attacked plaintiff, punching him in the head, face, arms, and chest.  (#4 at 13.)  Although plaintiff pushed the emergency button in the cell, no ESP officials responded, and plaintiff released the button once Simmons issued a threat.  (*Id.* at 13–14.)  Plaintiff maintains that the assault left his face, head, chest, and arms bruised, swollen, and bleeding, and three teeth loose.  (*Id.* at 13.)  Plaintiff submitted a medical kite and a grievance that day, but did not mention the assault explicitly.  (*See* #42-27 at 9–12.)  Neither plaintiff's case notes nor his medical charts reflect that the assault actually took place.  (*See* #42 at 14; #42-2 at 4; #43-3.)

Plaintiff maintains that he sent multiple kites and grievances to Baker, Fletcher, and Moore between April 29 and May 23.  (#4 at 14; #51 at 73.)  Allegedly in response to the April 29 grievance, Moore and the grievance coordinator decided to transfer plaintiff to a single cell in the

infirmary on May 7, 2014.  (#4 at 14; #42-3 at 3–4.)  Some of plaintiff's property, including his legal work, was confiscated as part of the transfer process.  (*Id.*)  On May 8 plaintiff kited to request that he be transferred back to his cell with Simmons.  Allegedly, the request was motivated by a conversation with Fletcher, who told plaintiff that no other cells were available and he would need to return to his cell with Simmons to recover his legal materials and other property.  (#4 at 14–15, 24; #42-17.)  Plaintiff and Simmons celled together for an additional two weeks before plaintiff was transferred to administrative segregation on May 23, 2014 due to safety concerns.  (#42-2 at 4.)

In addition to contesting plaintiff's version of events, defendants argue that they are entitled to summary judgment because (1) Moore responded reasonably to the threat to plaintiff's safety by transferring him to the infirmary on May 7; (2) plaintiff's failure to secure a new roommate, his request to transfer back to the cell with Simmons, and the lack of evidence of injuries from the assault suggest that the risk to plaintiff was not substantial; and (3) plaintiff's claims for mental and emotional injury are barred by 42 U.S.C. § 1997e(e) because he cannot prove he suffered an actual, physical injury.  (#42 at 21–24.)  For the reasons discussed below, the court finds that defendants' arguments are insufficient to foreclose the possibility that a reasonable jury could find for plaintiff.

The Eighth Amendment's stricture on the "unnecessary and wanton infliction of pain" also encompasses deliberate indifference to the safety of inmates.  *Farmer*, 511 U.S. at 833.  "[H]aving stripped [inmates] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course."  *Id.*  Prison officials must "'take reasonable measures to guarantee the safety of the inmates and to 'protect prisoners from violence at the hands of other prisoners.'"  *United States v. Stoterau*, 524 F.3d 988, 1013 (9th Cir. 2008) (quoting *Farmer*, 511 U.S. at 832–33).

"It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety."  *Farmer*, 511 U.S. at 834.  Like conditions of confinement claims, claims for a failure to protect have an objective and a subjective element.  *Hearns v. Terhune*, 413 F.3d 1036, 1040 (9th Cir. 2005); *see also Lemire v. Cal. Dep't of Corrs. & Rehab.*, 726 F.3d 1062, 1074-78 (9th Cir. 2013).

First, the inmate must establish that officials exposed him to an objectively substantial risk of serious harm. *Lemire*, 726 F.3d at 1075–76. Second, he must prove that the officials were deliberately indifferent—that is, that they disregarded their subjective awareness of the risk without reasonable justification. *Id.* at 1077–78. It is not enough that prison officials were aware of facts from which they *could* have inferred the presence of an excessive risk; they must also "draw the inference." *Id.* at 837. The culpable state of mind is "something more than mere negligence . . ." but "something less" than purpose or intent. *Hearns*, 413 F.3d at 1040. Circumstantial evidence, or the fact that the risk was obvious, may be sufficient to establish a prison official's deliberate indifference. *Cortez v. Skol*, 776 F.3d 1046, 1050 (9th Cir. 2015) (citing *Farmer*, 511 U.S. at 842).

Viewed in the light most favorable to plaintiff, the evidence presents a triable issue as to whether Simmons posed a substantial risk of serious harm. Plaintiff alleges that Simmons had a record of attacking cellmates at ESP, and defendants present no evidence to the contrary. Even if Simmons was not a substantial risk to plaintiff's safety at the time the two became cellmates, a jury could reasonably interpret plaintiff's kites and grievances to demonstrate that a substantial risk had emerged by April 29 or May 1. Further, given that the inmates were housed in a segregation unit, and plaintiff's clear distress over losing access to his legal materials, the court is not persuaded that plaintiff's failure to find a new cellmate or his request to return to the cell with Simmons substantially undermines his claim.

There is also sufficient evidence that Moore, Fletcher, and Baker knew there was a risk to plaintiff's safety. Moore reviewed plaintiff's April 29 grievance "on or about" May 2, and found the threat to plaintiff's safety significant enough to transfer him to the infirmary. (#42-3 at 4.) Nevertheless, that transfer did not occur until May 7, and plaintiff was soon transferred back to his cell with Simmons, where he stayed from May 8 until May 23. Fletcher and Baker also appear to have been alerted to plaintiff's safety concerns, by way of the grievances and kites plaintiff sent between April 29 and May 23. (*See* #51 at 73; #42-26; #42-27.) Under the circumstances, whether Moore, Fletcher, and Baker responded reasonably is a question of fact that precludes summary judgment. *See Castro v. Cnty. of L.A.*, 797 F.3d 654, 666–67 (9th Cir. 2015) ("This court has long

1   held that whether or not a prison official's actions constitute deliberate indifference is a subjective

2   inquiry and a question of fact.")

3   The court does find, however, that one defendant is entitled to summary judgment on this

4   claim.  Plaintiff names defendant Cox, NDOC Director, but fails to allege that Cox was aware of or

5   involved in plaintiff's placement with Simmons.  Although plaintiff asserts that Cox is responsible

6   for overcrowding at ESP, which in turn forced plaintiff to return to his cell with Simmons (#4 at

7   24), the connection is far too attenuated to establish an Eighth Amendment violation.  Accordingly,

8   the court recommends that defendant Cox be granted summary judgment as to count II.

9   **E.    Count III: Retaliation**

10   Plaintiff's count III retaliation claims stem from the same general events that gave rise to

11   count II.  In short, he asserts three incidents of retaliation: (1) Moore suggested that plaintiff cell

12   with Simmons, and then refused to transfer Simmons, in retaliation for the grievances and lawsuits

13   plaintiff filed against Moore prior to March, 2014; (2) Moore, Fletcher, and Baker transferred

14   plaintiff to the infirmary and confiscated his property on May 7 in retaliation for the grievances

15   plaintiff filed between April 29 and May 6; and (3) Moore, Fletcher, Baker, and Cox transferred

16   plaintiff to administrative segregation and confiscated his property on May 23 in retaliation for

17   plaintiff's grievances regarding the conditions of confinement at ESP, his double cell with

18   Simmons, and the May 1 assault.  (#4 at 26.)

19   It is well-established that prisoners may seek redress for retaliatory conduct by prison

20   officials under § 1983.  *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2004); *Brodheim v. Cry*,

21   584 F.3d 1262, 1269 (9th Cir. 2009).  "Prisoners have a First Amendment right to file grievances

22   against prison officials and be free from retaliation for doing so."  *Watison v. Carter*, 668 F.3d

23   1108, 1114 (9th Cir. 2012).  Within the prison context, a retaliation claim has five elements: (1) a

24   state actor took some adverse action against the inmate (2) because of (3) the inmate's protected

25   First Amendment conduct, and that the action (4) chilled the inmate's exercise of his First

26   Amendment rights and (5) did not reasonably advance a legitimate correctional goal.  *Robinson*,

27   408 F.3d at 567–68.  The inmate bears the burden of demonstrating that the exercise of his First

Amendment rights was a "substantial or motivating" factor for defendants' allegedly retaliatory conduct, *Brodheim*, 584 F.3d at 1271, as well as proving the absence of legitimate correctional goals, *see Hartman v. Moore*, 547 U.S. 250, 259 (2006); *Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995).

To prevail against defendants' motion for summary judgment, plaintiff must demonstrate a triable issue of material fact on each element of his retaliation claims. *Brodheim*, 584 F.3d at 1269 n.3. Defendants argue that plaintiff cannot do so successfully, as he has no evidence of the occurrence of an adverse action, causation, the chilling of his speech, or the lack of a legitimate penological goal. (#42 at 24–27.)

The court agrees that no reasonable jury could find plaintiff's transfer to the infirmary and administrative segregation, as well as the temporary confiscation of his property, to be adverse, retaliatory actions. Plaintiff made numerous complaints to defendants regarding his double celling placement. Defendants subsequently removed him from the cell. Defendants offer three sworn declarations, as well as plaintiff's case notes, which state that the two transfers were made based on the safety and security concerns plaintiff expressed in his grievances. (#42-2 at 4; #42-3 at 5; #42-4 at 4; #42-13 at 7.) Moreover, defendant Fletcher's declaration explains that moves to the infirmary or administrative segregation are typical when inmates with cellmate issues cannot find an alternative housing arrangement. (#42-4 at 4.) Plaintiff, on the other hand, has presented no evidence, apart from his own conclusory allegations, from which a jury could characterize the transfers as punishments. Nor has plaintiff shown that his property was confiscated out of retaliation. The same procedures are followed when any inmate moves between the general population, infirmary, and administrative segregation, as evidenced by OP 605 and OP 711. (#42-4 at 3–4; #42-19 at 6–7; #42-28 at 5–7.)

Plaintiff's claim that Moore retaliated against plaintiff for past grievances and lawsuits also fails. To survive summary judgment, an inmate must offer direct or circumstantial evidence to show that the challenged action was taken because of the inmate's First Amendment activities. *McCollum v. Cal. Dep't of Corr. & Rehab.*, 647 F.3d 870, 882 (9th Cir. 2011). Circumstantial

evidence of motive will typically include: (1) proximity in time between the protected conduct and the alleged retaliation; (2) defendant's expressed opposition to the protected conduct; or (3) other evidence that the defendant's proffered reasons for the challenged action are false or pretextual.  *Id.* "[M]ere speculation that defendants acted out of retaliation is not sufficient."  *Wood v. Yordy*, 753 F.3d 899, 905 (9th Cir. 2014).

Here, plaintiff has not offered direct evidence that Moore's actions with regard to the cell placement were done in retaliation for plaintiff's protected conduct.  Instead, plaintiff offers circumstantial evidence, arguing that "plaintiff had filed lawsuits and grievances against Moore and Moore wanted plaintiff to be assaulted . . . ."  (#4 at 25–26.)  However, plaintiff mentions just one lawsuit explicitly, *Johnson v. NDOC*, filed in 2013[3], and the only grievances discussed are ones filed prior to October 2012.  (#51 at 45.)  Moore did not suggest that plaintiff double cell with Simmons until March, 2014.  The timing alone, then, does not support an inference that Moore acted with retaliatory motive.  *See Vasquez v. Cnty. of L.A.*, 349 F.3d 634, 646 (9th Cir. 2004) (a thirteen month lapse is too long to support an inference of causality); *Quiroz v. Horel*, 85 F. Supp. 3d 1115 (N.D. Cal. 2015) ("In order to establish a causal link sufficient to survive summary judgment based solely on temporal proximity, the protected activity and the adverse action must be 'very close.'") (quoting *Clark Cnty. School Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)).

Plaintiff's remaining allegations are similarly vague.  Plaintiff contends that "Moore had a history of complaining to plaintiff about him filing grievances," but provides no further information about the alleged complaints.  (#51 at 45.)  Assuming *arguendo* that Moore did in fact "encourage" Simmons to attack plaintiff, as plaintiff contends (#4 at 13), plaintiff has not offered evidence from which a jury could reasonably conclude that such an action was *because of* plaintiff's exercise of his First Amendment rights.  Because defendants have shown that plaintiff cannot establish all five elements of a relation claim, summary judgment is appropriate.

_____

[3] Because plaintiff does not identify the case number or the court in *Johnson v. NDOC* is filed, and in light of the vast number of cases plaintiff has filed in this court, the court cannot be sure of the specific filing date.

**F.      Count IV: Equal Protection**

Plaintiff's final claims arise under the Fourteenth Amendment, and contend that defendants Koehn, Baker, Cox, and Moore created and followed various policies to discriminate against African American inmates at ESP.  First, plaintiff maintains that Koehn, Baker, and Cox created a "no cane and no wheelchair" policy for black inmates.  (#4 at 27.)  Second, plaintiff alleges that he was improperly required to wear leg restraints because he was African American, whereas Koehn, Baker, and Cox allow white inmates with physical disabilities to be transported without leg restraints.  (*Id.*)  Third, plaintiff contends that Moore, Baker, and Cox will allow white inmates to remain in a single cell, or will transfer white inmates to new cells to prevent fighting, but require African American inmates to remain double celled even when fights between cellmates are imminent.  (*Id.* at 28.)

As a preliminary matter, plaintiff asserted an identical challenge to the supposed "no cane and no wheelchair" policy in *Johnson v. Cox*, No. 3:14-cv-00213-RCJ-WGC, also pending before the district court.  Plaintiff filed *Johnson v. Cox* a month and a half prior to the instant case.  "Plaintiffs generally have no right to maintain two separate actions involving the same subject matter at the same time in the same court and against the same defendant."  *Adams v. Cal. Dep't of Health Servs.*, 487 F.3d 684, 688 (9th Cir. 2007), *overruled on other grounds by Taylor v. Sturgell*, 553 U.S. 880, 904 (2008).  Accordingly, the court finds that defendants are entitled to summary judgment with regard to the alleged no cane and no wheelchair policy.

Plaintiff's remaining claims also fail.  "Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race."  *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974).  To establish a violation, however, "a plaintiff must show that the defendant acted with an intent or purpose to discriminate against him based upon his membership in a protected class."  *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003).  Because the claim requires proof of intentional discrimination, "[m]ere indifference" to the unequal effects on a particular class does not establish discriminatory intent.  *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005).

-21-

Here, defendants maintain that plaintiff has failed to demonstrate that they acted with discriminatory intent. (#42 at 28.)  The court agrees.  Plaintiff alleges that he has a severe back and knee injury, and an "overly noticeable limp."  (#4 at 27.)   In sworn declarations, however, defendants submit that plaintiff has no identifiable disabilities in his back, knee, or shoulder.  (*See* #43-1; #43-2.)  Plaintiff exhibited no signs of a limp in examinations prior to June 20, 2014.  (#43-1 at 2–3.)  Although plaintiff's left leg appeared weak during the June 20 examination, Dr. Koehn opined that plaintiff was likely malingering due to inconsistencies in the exams, average tendon reflexes, and a lack of atrophy.  (*Id.* at 3.)  For his part, plaintiff has failed to present any evidence, apart from his own belief, that he was entitled to be moved without leg restraints.  Plaintiff's assertions regarding defendants' double and single cell placement decisions are similarly unsupported, relying entirely on vague, anecdotal observations of one or two other inmates.  (*See* #4 at 28; #51 at 49.)  Because plaintiff has not produced evidence of discriminatory intent, he has not raised an issue of fact as to whether defendants' conduct violated the Equal Protection Clause. Thus, defendants are entitled to summary judgment on plaintiff's Equal Protection claim.

## VI.    CONCLUSION

Based upon the foregoing, the court concludes that defendants are entitled to partial summary judgment.  With respect to count I, plaintiff has raised a genuine issue of material fact as to whether ESP's policy of double celling inmates on 23/24-hour lockdown violates the Eighth Amendment; however, plaintiff's allegations regarding other conditions of confinement are unsupported, and defendants have shown they are entitled to summary judgment as to those claims. In count II, the court recommends that summary judgment be granted in favor of defendant Cox, but finds that plaintiff has shown there to be triable issues as to whether Moore, Fletcher, and Baker were deliberately indifferent to the substantial risk inmate Simmons posed to plaintiff's safety. Defendants are entitled to summary judgment on counts III and IV.  Count III fails because defendants have shown that plaintiff cannot establish all five elements of a First Amendment retaliation claim.  Finally, count IV fails due to an identical challenge raised in a prior case pending before the district court, and because plaintiff failed to offer evidence of discriminatory intent.

The parties are advised:

1.      Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this Report and Recommendation within fourteen days of receipt.  These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.      This Report and Recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

## VII.   RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that defendants' motion for summary judgment (#42) be **GRANTED** as to count I, to the extent that plaintiff challenges the ESP fire safety system, medical emergency button, hand and ankle restraints, sanitation, and mental health care, and "no cane" policy; count II, as asserted against defendant Cox; count III; and count IV.

**IT IS FURTHER RECOMMENDED** that defendants' motion for summary judgment (#42) be **DENIED** as to count I, to the extent plaintiff challenges ESP's double celling policy; and count II, as asserted against defendants Moore, Baker, and Fletcher.

**IT IS FURTHER RECOMMENDED** that defendants' motion to strike plaintiff's motion for summary judgment (#50) be **GRANTED** and plaintiff's motion for summary judgment (#47) be **STRICKEN.**

**IT IS FURTHER RECOMMENDED** that plaintiff's motion to request that the court rule on his motion for summary judgment be **DENIED** (#57) as moot.

**DATED:**  January 21, 2016.

_____
**UNITED STATES MAGISTRATE JUDGE**